IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2020 Session

## LAUREL MARTIN GRIFFIN v. KEVIN MICHAEL GRIFFIN

**Appeal from the Chancery Court for Williamson County**
**No. 45837          James G. Martin, III, Chancellor**

_____

### No. M2019-01113-COA-R3-CV

_____

After seventeen years of marriage, a wife filed a complaint for divorce. The husband answered and filed a counter-complaint for divorce. The trial court granted the wife a divorce, named her primary residential parent of the parties' minor children, classified and divided the marital estate, ordered the husband to pay the wife $1,941 per month in child support, and awarded the wife alimony in futuro in the amount of $6,000 per month. The husband appealed. We affirm the trial court's designation of Wife as the primary residential parent and the division of the marital estate as modified. We vacate the award of child support and the amount of alimony and remand for recalculation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Sarah Richter Perky and Cathy Speers Johnson, Franklin, Tennessee, for the appellant, Kevin M Griffin.

Larry Hayes, Jr., and Rachel Thomas, Nashville, Tennessee, for the appellee, Laurel Martin Griffin.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Laurel Martin Griffin ("Wife") and Kevin Michael Griffin ("Husband") met in Los Angeles, California in 1992; Husband moved to New Orleans, Louisiana shortly thereafter. While the parties lived in different states, they dated other people. They started seeing each other exclusively in 1997 after Wife moved to New Orleans. The parties married on

October 6, 2001, and have three children: an adult son and two minor children (born in 2008). In 2006, the parties moved back to Los Angeles and remained there for approximately five years. In January 2011, they moved to Franklin, Tennessee. On January 10, 2017, after approximately seventeen years of marriage, Wife filed a complaint for divorce. Husband filed an answer and counter-complaint for divorce on February 21, 2018.

*The Parties' Education and Work History*

The trial court heard the matter on December 4, 5, and 18, 2018, and January 14, 2019. At the time of trial, Wife was forty-eight years old and in good health. Prior to the marriage, she attended Louisiana State University for two years and then moved to Los Angeles where she attended Santa Monica Junior College and California State University in pursuit of a degree in Sociology. She never obtained her degree. Wife testified that, while living in California, she worked mostly part-time hours at several retail stores, a vet clinic, and a coffee shop. She later obtained full-time employment as a personal assistant at Mercury Records and, after moving to Louisiana, worked for a salvage business selling architectural antiques. At all of these jobs, Wife earned between $7 and $10 per hour. The most that Wife earned in a single year was $23,501 in 1996, the year before she began living with Husband in New Orleans.

Wife had no significant employment outside of the home during the marriage.[1] Instead, she fulfilled the roles of homemaker and primary caregiver for the parties' children. Wife stated that, although she had assistance from a housekeeper for a couple of hours at least one day each week, she still did all of the family's laundry and cooking. Until 2011, Wife also had childcare assistance for at least part of the day Monday through Friday; she did not have childcare assistance once the children began attending school. Wife testified that the parties' two younger children were actively involved in extracurricular activities. She was the one primarily responsible for transporting the children to and from their extracurricular activities and for purchasing the necessary equipment. Wife frequently participated at the children's school by organizing activities, parties, field trips, and fundraisers.

When asked about the parties' parenting styles, Wife described them both as "liberal but not permissive." She believed that Husband loved the children and was a good father. Because she had always been the children's primary caregiver, however, Wife asked the court to designate her as the primary residential parent. She acknowledged that, prior to trial, she purchased a home in College Grove, which was twenty-one miles from the marital residence and would require the children to change schools if she was designated the primary residential parent.

---

[1] In 2016 and 2017, Wife worked for the Pilgrimage Music and Cultural Festival. She earned $5,287 in 2016 and $14,999 in 2017.

At the time of trial, Husband was fifty-two years old and in good health. He testified that he was the primary wage earner during the marriage. He has a bachelor's degree in English from Louisiana State University but does not use his degree. Rather, Husband earns a living as a guitar player, songwriter/engineer, business man, speaker, and lead singer for a band known as Better Than Ezra. Additionally, Husband helped found the Pilgrimage Music and Cultural Festival ("Pilgrimage Festival" or "Festival"), which has been held in Franklin each September since 2015. Husband submitted evidence showing he had significant earnings between 1995 and 2016. A large portion of these earnings came from royalties for songs that he wrote or co-wrote and/or that Better Than Ezra recorded. Tax returns for the years 2015, 2016, and 2017 showed that he had an average monthly income of $25,102.

Prior to trial, the parties separated the musical compositions Husband wrote during the marriage from those he wrote prior to the marriage. Husband's financial manager, Michael Bergeron, testified about the royalty income from the marital compositions. He stated that, in both 2017 and 2018, the marital royalty income was approximately $103,000 per year. He opined that the marital royalty income would continue at that level for a period of eight to ten years. During direct examination, Husband asked the trial court to divide the marital royalty income equally to create a source of income for Wife. According to Husband, dividing the marital royalty income would provide Wife with a monthly income of $4,377. Husband stated that he was willing to guarantee that Wife received that amount each month for up to eight years "[a]s long as it's used in determining whatever alimony" the court might award Wife.

Husband testified that he traveled extensively with his band and in pursuit of his songwriting career. His travel schedule is planned in advance, but it often changes with very little notice. Prior to Wife filing for divorce, Husband was home thirty to forty percent of the year. Since Wife filed for divorce, however, he had spent more time working from his home studio. This allowed him to become more involved with the children's lives. For instance, Husband stated that he began to coach their athletic teams occasionally, help them with their homework, take them on trips, and get up with them in the mornings to make them breakfast. He characterized his parenting style as "positive" and "supportive" by encouraging the children to socialize and participate in extracurricular activities. In contrast, he characterized Wife's parenting style as much more passive because "she doesn't request anything of them" and "let[s] them languish with their Xbox or stuff like that." Husband believed that Wife promoted a permissive environment because she displayed a picture in the marital home of her holding a marijuana cigarette. He planned to continue living in the marital residence after the divorce. Thus, he asked the trial court to designate him as the primary residential parent so the children would not need to change schools.

*The Pilgrimage Festival*

A major point of contention during trial was the parties' interest in Pilgrimage Presents, LLC ("Pilgrimage Presents"), the owner of the Pilgrimage Festival. Husband testified that, in November 2013, he went for a run in Harlinsdale Park and thought it would be a good location to have a family-friendly festival similar to the Jazz and Cultural Festival in New Orleans. Thereafter, he entered into a partnership with two other people, and they all began meeting with community leaders in Franklin to generate interest in the event. Husband made significant efforts in planning and preparing for the Festival throughout 2014 and 2015. He met with numerous people to promote the Festival, prepared at least thirty-two presentations, and raised additional capital through various investors. Wife had no direct involvement with any of these efforts, but she testified that she worked the Festival's merchant area every year except 2018.

The Festival was held for the first time in September 2015. Husband stated that it was not profitable that year, losing approximately $1,200,000. The Festival again lost money in 2016, but it was more successful than the previous year. In 2017, Justin Timberlake and other popular acts performed at the Festival, and the Festival generated a profit that year. Unfortunately, heavy rain caused the Festival to be canceled in 2018 after only six hours, resulting in a debt of $2,000,000. Husband testified that the Festival was insured, but he was not sure how much of the debt would be reimbursed because, at the time of trial, the insurance company had not yet processed the claim. At a minimum, he stated, he and his two partners were liable for a $1,000,000 line of credit with SunTrust Bank for the 2018 Festival. His personal liability on the loan was $333,333.

Husband testified that he and Wife owned 9.7242% of Pilgrimage Presents, 3.4004% directly and 6.3283% indirectly through their interest in a separate entity, Bring the Wood, LLC. Tom Price, a certified public accountant and certified valuation analyst, testified on behalf of Husband regarding the value of Pilgrimage Presents. Due to the $2,000,000 debt caused by canceling the Festival in 2018 and the liability for the $1,000,000 loan, Mr. Price valued Pilgrimage Presents as "either a negative or zero." Despite this valuation, Wife asked the trial court to divide the parties' interest in Pilgrimage Presents. Husband asked the trial court to award the entire 9.7242% interest to him because he did not want to remain in business with Wife. Moreover, he stated that the only way the Festival would be profitable in the future would be hard work by him and others, not any effort by Wife.

*Trial Court's Decision*

In an order entered on March 5, 2019, the trial court granted Wife a divorce and then classified, valued, and divided the marital estate. The court awarded Wife 50% of the marital royalty income and ordered Husband to guarantee that she receive $4,377 per month in marital royalty income for eight years. After finding that Wife had no skills or

- 4 -

education that would equip her to obtain employment, the trial court awarded her alimony in futuro in the amount of $6,000 per month. Finally, the court designated Wife as the primary residential parent, set a residential parenting schedule granting the parties equal parenting time, and ordered Husband to pay child support to Wife in the amount of $1,941 per month. Husband appealed.

On appeal, Husband presents the following issues for our review: 1) whether the trial court erred in designating Wife as the primary residential parent, 2) whether the trial court failed to make a full and equitable division of the marital estate, 3) whether the trial court erred in determining child support by miscalculating the parties' incomes, and 4) whether the trial court erred in the amount, type, and duration of alimony awarded to Wife.

ANALYSIS

I. Primary Residential Parent.

Husband argues that the trial court abused its discretion in failing to designate him as primary residential parent so that the parties' children would not have to change schools. In any divorce proceeding "involving a minor child," a trial court "shall incorporate a permanent parenting plan." Tenn. Code Ann. § 36-6-404(a). The parenting plan must allocate parenting responsibilities, establish a residential parenting schedule, and award child support. *See* Tenn. Code Ann. § 36-6-402(3). When establishing a residential parenting schedule, a court must designate one parent as the primary residential parent and then designate with which parent the child will reside on given days during the year. Tenn. Code Ann. § 36-6-402(5); *see also Armbrister v. Armbrister*, 414 S.W.3d 685, 695 (Tenn. 2013). The General Assembly has declared that custody determinations "shall be made on the basis of the best interest of the child" and must "permit[] both parents to enjoy the maximum participation possible in the life of the child" consistent with the factors set forth in Tenn. Code Ann. § 36-6-106(a)(1)-(15). Tenn. Code Ann. § 36-6-106(a).

Because custody determinations are factually driven and "often hinge on subtle factors," trial courts have "broad discretion in these matters." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996); *see also Armbrister*, 414 S.W.3d at 693. Therefore, appellate courts decline to reverse a trial court's custody determination absent an abuse of discretion. *Armbrister*, 414 S.W.3d at 693. A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

The trial court expressed concern during trial that the children would have to change schools if Wife was designated primary residential parent:

The evidence in this case is undisputed that these little boys have been here in Williamson County since January 2011. They have gone to Montessori school for three years. They have now been at Poplar Grove for the last two-plus years as they're in their third grade year now. Every bit of the testimony I have heard so far is that they're thriving. And then the mom goes and buys a house through her family's trust in College Grove, 21 miles away from here. I'm just troubled by that. It's going to interfere - - certainly, it's going to require a change of school. They can't go to Poplar Grove and live in College Grove anymore unless the Court names the father as the primary residential parent. And then if he's the primary residential parent, then I can at least give [them] the possibility of going to Poplar Grove.

On the other hand, in the Court's mind, I don't have the authority to designate somebody as a primary residential parent solely because of the school options.

Despite this concern, the trial court designated Wife as the primary residential parent after considering all of the relevant factors in Tenn. Code Ann. § 36-6-106(a) and concluding that they favored Wife. It appears that the court placed considerable weight on the following factors:

(1) [Wife] has performed the majority of the parenting responsibilities relating to the daily needs of the parties' children. The strength, nature and stability of her relationship with the children is greater than the strength, nature and stability of the relationship between [Husband] and the parties' children even though the Court finds his relationship to be strong.

(2) Both parties presented evidence of past and potential for future performance of parenting responsibilities. Both parties are eager and willing to be designated the children's primary residential parent. The Court does not find that either party has engaged in conduct designed to disparage the relationship between the children and the other party. The Court finds that [Wife] has a greater desire and ability to encourage a close and continued relationship with the children than [Husband] simply because she views him in a much more positive light than [Husband] views [Wife].

. . . .

(5) [Wife] has been the primary caregiver of the children throughout their lives. [Husband] has participated more in the children's lives since [Wife] filed her Complaint and the Court commends him for doing so.

. . . .

(10) Continuity for the parties' children is important. However, the Court does not find that the parents' divorce is going to disrupt that continuity inasmuch as the children will enjoy significant parenting time with each of their parents.

. . . .

- 6 -

(14) [Husband's] employment schedule makes it difficult for him to adhere to a strict parenting schedule.

The evidence in the record does not preponderate against these findings. Wife testified that, for most of the marriage, Husband spent only thirty to forty percent of each year at home because he toured heavily with his band and for his songwriting career. Thus, Wife had been the primary caregiver for the children since they were born. She took the children to almost all of their medical appointments. She also took them to and from their extracurricular activities and procured the necessary equipment for those activities. Wife often participated at the children's school. For instance, when the children attended Montessori school, Wife worked in their classrooms, served on the school's board of directors, and organized activities at the school. While the children were in grades kindergarten through third, she acted as a room mother for one or both of the children, a position that required her to organize parties for the children's classes and arrange gifts for their teachers on birthdays and Christmas. Wife had also attended all of the children's field trips since they started kindergarten. Although Husband began spending more time at home after Wife filed for divorce, he still spent about fifty percent of the year traveling, and his travel schedule often changed with little notice.

As the trial court noted, it is concerning that the children would be required to change schools with Wife designated as the primary residential parent. The children had attended the same school since kindergarten, and they had done well there. This concern, however, does not outweigh the factors favoring Wife's designation as the primary residential parent. We conclude that the trial court did not abuse its discretion in designating Wife as the primary residential parent.

II. Division of the Marital Estate.

A. Applicable legal standards.

Because Tennessee is a dual property state, a trial court must identify all of the divorcing parties' assets and classify them as either separate property or marital property prior to making an equitable division of the marital estate pursuant to Tenn. Code Ann. § 36-4-121. *Gilbert v. Gilbert*, No. E2009-02118-COA-R3-CV, 2011 WL 13165341, at *3 (Tenn. Ct. App. Sept. 15, 2011). The General Assembly has defined separate property to include the following:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;
(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2) (footnote omitted). Only marital property is subject to division, and it is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A); *see also Gilbert*, 2011 WL 13165341, at *4.

After classifying property as either separate or marital, a trial court should "place a reasonable value on each piece of property subject to division." *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). When determining the value of a marital asset, "a trial court should consider all competent and relevant evidence pertaining to the valuation of that asset." *Bertuca v. Bertuca*, No. M2006-00852-COA-R3-CV, 2007 WL 3379668, at *4 (Tenn. Ct. App. Nov. 14, 2007). The parties bear the burden of presenting competent evidence for the trial court to consider in making a proper valuation determination. *Id.* A trial court is then "free to place a value on a marital asset that is within the range of evidence submitted." *Id.*

Issues concerning the classification and valuation of property present questions of fact. *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009); *Owens*, 241 S.W.3d at 485. Therefore, we review a trial court's decision classifying and valuing property de novo with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Bertuca*, 2007 WL 3379668, at *4. A trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

After the parties' property has been classified as either separate or marital, a trial court must divide the marital estate equitably by considering the relevant factors identified in Tenn. Code Ann. § 36-4-121(c).[2] *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn.

---

[2] The relevant factors include the following:

(1) The duration of the marriage;

- 8 -

2010). To be considered equitable, the division of marital property does not need to be "precisely equal," and it is not necessary that each party "receive a share of every piece of marital property." *Owens*, 241 S.W.3d at 490. Because "[t]he division of the marital estate includes both the division of the marital property and the allocation of the marital debt," appellate review of a trial court's division of marital property "must take into consideration how the trial court allocated the marital debt." *Id.* A trial court has "broad discretion in fashioning an equitable division of marital property," *id.,* and we will not "'disturb the trial court's decision unless the distribution lacks proper evidentiary support or results from some error of law or misapplication of statutory requirements and procedures.'" *Davis v. Davis*, No. M2015-02106-COA-R3-CV, 2016 WL 7479138, at *2 (Tenn. Ct. App. Dec. 29, 2016) (quoting *Watson v. Watson*, 309 S.W.3d 483, 495 (Tenn. Ct. App. 2009)).

### B. Debt from the Pilgrimage Festival.

Husband contends that the trial court failed to make a full and equitable division of the marital estate because it did not account for all of the marital indebtedness.

---

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

Specifically, he argues that the trial court failed to account for his $333,333 personal liability for the SunTrust loan associated with the 2018 Pilgrimage Festival. For the reasons discussed below, we respectfully disagree.

In the March 5, 2019 order, the trial court awarded Husband the 9.7242% interest in Pilgrimage Presents along with all of the interest he owned in five other companies.[3] Under the marital debt section of the order, the trial court identified the following debt: "[Husband's] Share of Debt Associated with Guaranty on Note Relating to Pilgrimage Presents LLC ([Husband] is Jointly and Severally Liable With Two Others as guarantors on $1,000,000.00 Note Owed to SunTrust Bank)" with a value of $333,333.33. The court then stated that Husband "shall be responsible for paying any and all debts relating to and/or secured by a lien on the business interests awarded him pursuant to the terms of this Memorandum and Order and shall hold [Wife] harmless from any liability therefor."

Husband correctly points out that, in cells F7 and G7 of the equitable division table attached to the March 5, 2019 order, the trial court stated that the value of the "[d]ebt relating to and/or secured by a lien on the business interests awarded to him" was "unknown." It appears, however, that the trial court accounted for the SunTrust loan elsewhere in the chart. In cells C8 and C9, the trial court awarded Husband his interest in Pilgrimage Presents and one-half of a $150,000 note payable to him by Pilgrimage Presents. The court then valued both of these assets at $0. The valuation of these assets was based upon Mr. Price's testimony regarding Husband's interest in Pilgrimage Presents. Mr. Price testified that he valued Husband's interest in Pilgrimage Presents at $0 based, in part, on his consideration of Husband's $333,333 personal guarantee on the SunTrust Bank loan.

We, therefore, conclude that the trial court accounted for Husband's personal liability on the SunTrust loan when it divided the marital property and allocated the marital debt.

C. Calculation errors.

Husband next contends that the trial court erred in calculating the division of the marital assets, resulting in a "grossly disproportionate and inequitable division of the marital estate." Using the trial court's calculations, Wife received marital assets in the net amount of $562,279.70 (49%) and Husband received a net amount of $574,313.81 (51%). Husband asserts that the trial court incorrectly calculated the marital portion of his retirement account when dividing the marital estate. We agree that the trial court made calculation errors regarding Husband's retirement account.

---

[3] These other companies include Ezra Dry Goods, Inc., Ezra and Sons, LLC, BTE et CIE, LLC, Pint of Mirth, LLC, and Bring the Wood.

At trial, it was undisputed that Husband had maintained a Morgan Stanley investment account, the marital portion of which was valued at $79,913, and a Morgan Stanley profit-sharing retirement account, the marital portion of which was valued at $226,035.17. The trial court awarded Husband all of the marital portion of the investment account ($79,913) and divided the marital portion of the profit-sharing retirement account equally between the parties with each party receiving $113,017.59. When calculating the division of the marital estate in the property division chart, however, the trial court incorrectly calculated Husband's half of the marital portion of the profit-sharing account as the account's entire balance, $226.035.17, rather than as $113,017.59. The court then incorrectly calculated Wife's half of the profit-sharing account as $79,913 rather than $113,017.59.

Once the trial court's mathematical errors are corrected, Wife would receive marital assets with a net value of $595,384.29 (56%) and Husband would receive a net amount of $461,296.23 (44%). A thorough examination of the March 5, 2019 order shows that the trial court intended to make a substantially equal division of the marital estate, however, as the court ordered many of the assets to be divided equally.[4] Considering the statutory factors, a substantially equal division would be equitable. For instance, it was a marriage of long duration, the parties were close in age, and both made contributions to the acquisition of the assets during the marriage. Because the trial court intended to make a substantially equal division of the marital estate but the calculation corrections result in an unequal division, it is appropriate to modify the trial court's order by awarding Husband $56,477.23 from the sale proceeds of the lot adjoining the marital residence, which was valued at $476,482.92, and award the remainder to Wife. *See Headrick v. Headrick*, No. E2005-02657-COA-R3-CV, 2006 WL 2872469, at *4 (Tenn. Ct. App. Oct. 10, 2006) (after concluding that certain property should have been included in distribution and that adding the property would result in an unequal distribution, modifying the trial court's order to reflect a substantially equal distribution is appropriate when the order demonstrates that was the trial court's intent). This modification results in Husband receiving $517,773.46 (49%) in marital assets and Wife receiving $538,907.06 (51%).

D. Marital royalty income guarantee.

Husband next argues that the trial court erred in ordering him to guarantee Wife's royalty payments for eight years. Mr. Bergeron testified at trial that 46.55% of Husband's royalty income came from marital compositions while 53.5% came from non-marital compositions. This allocation translated into approximately $105,055 per year that Husband received in marital royalty income. Mr. Bergeron opined that the marital royalty

---

[4] The trial court ordered that the following assets be divided equally: (1) Southwest Airlines rapid rewards points, (2) US Airlines miles, (3) marital portion of the profit-sharing retirement account, (4) the royalties from Husband's marital compositions, and (5) a $150,000 note payable to Husband by Pilgrimage Presents, LLC.

income would remain near that amount for eight to ten years. Husband asked the trial court to divide the marital royalty income equally between the parties ($52,500 each), which would provide Wife with a monthly income of $4,377. He told the court that he would be willing to guarantee that Wife received $4,377 per month in royalty income for eight years "provided that the royalty income served to satisfy alimony." On appeal, Husband contends that the trial court should not have ordered him to guarantee Wife's royalty income for eight years because that income was not used to address Wife's need for alimony.

When Husband raised this issue at trial, the judge had a candid discussion with him about how his willingness to guarantee Wife's monthly royalty income was a separate issue from any alimony obligation he may have to Wife:

> THE COURT: So in figuring that out, you would have to basically look at it on an annual basis. So at the end of a year you would look back on the 12 months preceding, total up the royalties that were paid to you and the royalties paid to your wife, they ought to be the same. And then if it comes up to 52,500 or more, then there wouldn't be any question. If it's less than 52,500, then you would write her a check for the difference.
> THE WITNESS: Yes, sir. May I - - may I qualify?
> THE COURT: Well, yeah, I mean, I'm asking you.
> THE WITNESS: As long as it's used in determining whatever alimony you deem [Wife] is - -
> THE COURT: Well, I don't know. That'll be up to the Court.
> THE WITNESS: Yes, sir.
> THE COURT: I just want to know how strongly you feel about the value of this asset.
> THE WITNESS: I do feel strongly up to eight years, and then it gets gray. I just don't know.
> THE COURT: Now we're getting real, you see because Mr. Bergeron said ten, or at least that's my memory. And now you're saying eight.
> THE WITNESS: Yes, sir.

The phrase, "Be careful what you wish for, lest it come true" is an apt description for these facts. Husband asked the trial court to award Wife fifty percent of the marital royalty income in order to provide Wife a monthly income of $4,377. Of his own volition, Husband then told the court that he felt so strongly about this asset that he was willing to guarantee that Wife received $4,377 per month for up to eight years. As the above exchange shows, the trial court made Husband aware when he agreed to the guarantee that it was unrelated to any alimony obligation he may owe to Wife. Husband has cited no authority demonstrating that the trial court's division of the marital estate with the guarantee regarding the marital royalty income to Wife constituted reversible error, and we are unaware of any. This argument is without merit.

III.  Child Support.

Husband asserts that the trial court erred in determining his child support obligation by miscalculating the parties' incomes.  Under Tennessee law, parents have a legal obligation "to support their minor children in a manner commensurate with their own means and station in life."  *Richardson v. Spanos*, 189 S.W.3d 720, 724 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 34-1-102(a).  The Child Support Guidelines promulgated by the Tennessee Department of Human Services govern child support determinations.  Tenn. Code Ann. § 36-5-101(e); *see also Richardson*, 189 S.W.3d at 724-25.  Trial courts still retain some discretion when determining child support despite the adoption of the child support guidelines.  *Horine v. Horine*, No. E2013-02415-COA-R3-CV, 2014 WL 6612557, at *4 (Tenn. Ct. App. Nov. 24, 2014) (citing *Richardson*, 189 S.W.3d at 725).  Therefore, we review a trial court's child support determination under the abuse of discretion standard.  *Id.*

Generally, when determining child support, the most important factor is "the amount of a parent's income."  *Anderton v. Anderton*, 988 S.W.2d 675, 680 (Tenn. Ct. App. 1998); *see also Eldridge v. Eldridge*, 137 S.W. 3d 1, 23 (Tenn. Ct. App. 2002).  After ascertaining the obligor parent's income, the guidelines require a court "to calculate the required amount of support using the percentages provided in the guidelines."  *Anderton*, 988 S.W.2d at 680.  The amount derived from this calculation "becomes the presumptive amount of child support owed."  *Richardson*, 189 S.W.3d at 725.  Because this presumption is rebuttable, a court may deviate from the amount required by the guidelines so long as the court makes "specific written findings regarding how the application of the Child Support Guidelines would be unjust or inappropriate in the case."  *Id.*; *see also* Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-02-04-.07.

In the present case, the trial court designated Wife as the primary residential parent and granted Husband 181 days of parenting time per year.  The trial court then set Husband's child support obligation at $1,941 per month based on its finding that Husband's monthly income was $25,102 and that Wife's monthly income was $4,377.  Husband asserts that the trial court should have added an additional $2,600 to Wife's monthly income because "the proof was uncontroverted that [Wife] had a historic earning capacity of $15 per hour in 2015, 2016, and 2017, resulting in a gross income of $2,600 per month for full-time employment."  The evidence in the record, however, contradicts Husband's assertion.  Wife's social security statement of wages shows that her pre-marital monthly earnings averaged approximately $464.  For the first fifteen years of the marriage, all of her earnings combined equaled $310 for the entire time period.  The only years of the marriage in which Wife earned more than $500 were 2016 ($5,287) and 2017 ($14,999), when Husband and his business partners paid her for working at the Pilgrimage Festival.

In light of the foregoing, we conclude that the trial court correctly set Wife's monthly income at $4,377.[5]

The evidence, however, preponderates against the trial court's finding that Husband had a monthly income of $25,102. At trial, the parties introduced into evidence their joint tax returns from 2015, 2016, and 2017. It was undisputed that Husband's average monthly income during those three years was $25,102, but Husband testified that his average monthly income was $25,102 only if he received all of the royalty income. If the trial court awarded Wife fifty percent of the marital royalty income, Husband stated, his monthly income would be $20,725. Wife did not present evidence contradicting Husband's testimony on this issue nor did the trial court find his testimony about this matter not credible. Thus, because the trial court awarded Wife fifty percent of the marital royalty income, it incorrectly calculated Husband's child support obligation by using $25,102 as the amount of his monthly income. We, therefore, vacate the trial court's child support determination and remand for recalculation.

IV. Spousal Support.

Husband challenges the trial court's award of alimony on two grounds. First, he argues that the trial court abused its discretion in awarding Wife alimony in futuro rather than rehabilitative alimony because the proof "clearly established" that it was feasible to economically rehabilitate Wife. Second, he argues that the amount of alimony awarded exceeded his ability to pay. Because spousal support decisions are "factually driven and involve[] the careful balancing of many factors," a trial court has "broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski*, 350 S.W.3d at 105 (footnote omitted). Therefore, we review a trial court's spousal support decision under the abuse of discretion standard. *Cain-Swope v. Swope*, 523 S.W.3d 79, 94 (Tenn. Ct. App. 2016). Our review of a trial court's discretionary decision should determine "whether there is a factual basis for the decision in the record, whether the court properly identified and applied the applicable legal principles, and whether the decision is within the range of acceptable alternative dispositions." *Id.* at 95; *see also Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

---

[5] In his appellate brief, Husband argues alternatively that the trial court should have imputed income to Wife pursuant to Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(IV). Husband is correct that this regulation permits a court to impute $35,936 in annual gross income to a female parent "when there is no reliable evidence of a parent's income." TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2)(iv). Here, Wife presented reliable evidence of her income or income potential when she entered into evidence her social security statement of wages. Thus, Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv) is not applicable to the facts of this case. *See In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *13 (Tenn. Ct. App. Feb. 23, 2018) (stating that the regulation "'is only available in the event reliable evidence of a parent's income or income potential is not presented'") (quoting *Garrett v. Elmore*, No. M2013-01564-COA-R3-JV, 2014 WL 3763806, at *11 (Tenn. Ct. App. July 29, 2014)).

Husband first contends that the trial court abused its discretion in awarding Wife alimony in futuro rather than rehabilitative alimony. Tennessee recognizes four types of alimony: "(1) alimony in futuro; (2) alimony in solido; (3) rehabilitative alimony; and (4) transitional alimony." *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) (citing Tenn. Code Ann. § 36-5-121(d)(1)). Alimony in futuro and alimony in solido are considered forms of long-term spousal support. *Gonsewski*, 350 S.W.3d at 107-08. Alimony in futuro provides support until the recipient either remarries or dies and may be awarded "when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible." *Mayfield*, 395 S.W.3d at 115. Typically, courts award alimony in solido "to adjust the distribution of the marital estate," *id.*, and it is "paid in a lump sum payment of cash or property, or paid in installments for a definite term," *Gonsweski*, 350 S.W.3d at 108.

By contrast, rehabilitative alimony and transitional alimony are forms of short-term spousal support. *Mayfield*, 395 S.W.3d at 115. Rehabilitative alimony "'is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency,'" *id.* (quoting *Gonsewski,* 350 S.W.3d at 109), by enabling him or her to acquire additional training or education, *Gonsewski*, 350 S.W.3d at 108. Transitional alimony provides "'bridge-the-gap'" support to a spouse who is already self-sufficient "'but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.'" *Mayfield*, 395 S.W.3d at 115 (quoting *Endgesser v. Endgesser*, 42 So. 3d 249, 251 (Fla. Dist. Ct. App. 2010), and *Gonsewski*, 350 S.W.3d at 109).

Our spousal support statutes reflect a legislative preference favoring rehabilitative or transitional alimony over alimony in futuro or alimony in solido. Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350 S.W.3d at 109. Tennessee Code Annotated section 36-5-121(d)(2) defines "rehabilitated" as "to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse." An award of long-term support is not "a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because 'two persons living separately incur more expenses than two persons living together.'" *Mayfield*, 395 S.W.3d at 115 (quoting *Gonsewski*, 350 S.W.3d at 108). The standard of living enjoyed by the parties during the marriage factors into a court's support determination, but "the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage." *Id.* at 115-16.

When making spousal support determinations, courts consider the following factors:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal;

(8) The provisions made with regard to the marital property as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10)   The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)   The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)   Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).  In addition to considering each relevant factor enumerated in Tenn. Code Ann. § 36-5-121(i), courts must consider "'the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)).  These last two factors are the most important. *Id.*

An examination of the above factors in light of the evidence in the record militates in favor of an award of alimony in futuro to Wife.  In regard to the first factor, Husband's earning capacity far exceeds that of Wife.  He has been a successful musician, performer, songwriter, and co-founder of the Pilgrimage Festival. Between 2015 and 2017, Husband's gross monthly income averaged $25,102, whereas the only income Wife earned during that three-year period was $5,287 in 2016 and $14,999 in 2017 for her work at the Pilgrimage Festival—employment that is no longer available to her.  Husband also has greater financial resources than Wife due to the substantial income producing nature of the song

- 16 -

royalties classified as his separate property. Wife, on the other hand, has minimal work experience due to her roles during the marriage as a caregiver and homemaker. Thus, as the trial court found, she has no significant employability or earning capacity.

Regarding factor two, Husband has a bachelor's degree in English that he does not use in his employment. Wife has some college education in pursuit of a degree in sociology, but she did not obtain a degree. Rather, she devoted her life to being a caregiver and homemaker. Husband correctly points out that Wife may be able to receive additional education or training to obtain a degree or that she could obtain employment in retail similar to what she had prior to the marriage. Although these possibilities may enable her to earn some income, we disagree that they show that Wife could be economically rehabilitated. As discussed above, whether a disadvantaged spouse can be rehabilitated is measured against the marital standard of living or the other spouse's post-divorce standard of living. *See* Tenn. Code Ann. § 36-5-121(d). We agree with the trial court's finding that it would be nearly impossible, even with a degree or retail employment, for Wife to increase her earning capacity to a reasonable level in light of the high standard of living the parties enjoyed during the marriage or Husband's substantial monthly income.

Factor three concerns the length of the marriage; the parties were married for seventeen years, which constitutes a marriage of reasonably long duration. As for factors four and five, the parties are of similar age, and both are in good mental and physical health. In regard to factors six and seven, Wife remains the children's primary caregiver, in large part due to Husband's work and travel schedule. Husband had separate property the trial court found was "worth $1 million or more," which far exceeded Wife's separate property that the court found was worth "approximately $100,000-$115,000." The property division was nearly equal, but the marital assets awarded to each party are not substantial enough to afford either party the ability to live off the income from those assets.

Factor eight concerns the parties' standard of living during the marriage. The trial court found that "[t]he parties lived a very high standard of living during the marriage. . . . They have driven nice cars, have lived in nice homes, and have taken nice trips and vacations." With respect to factor ten, both parties made contributions to the marriage— Wife as a homemaker and Husband as the wage earner. Finally, regarding factor eleven, the trial court found Husband to be at fault for the dissolution of the marriage.

Pertaining to her need for alimony, Wife entered into evidence an income and expense statement claiming she had approximately $19,425 in monthly expenses. The trial court thoroughly assessed the necessity of each of Wife's purported expenses and found that several were excessive. For instance, she claimed rent in the amount of $5,000 when the home she planned to live in actually had a monthly mortgage of $1,856.84. The court reduced Wife's claimed expenses by $6,316.90, leaving her with $13,108.10 in monthly expenses. Thus, we agree with the trial court that Wife established a need for alimony.

With respect to Husband's ability to pay, the only finding made by the trial court was that he had an average gross monthly income of $25,102. As discussed above, however, Husband received that amount only if he collected all of the marital song royalties. The trial court awarded Wife 50% of the marital royalty income, resulting in a decrease of $4,377 in Husband's gross monthly income. Therefore, his gross monthly income was $20,725, not $25,102.

Although Husband earns a substantial income, we are concerned about the lack of findings by the trial court regarding Husband's ability to pay alimony in the amount of $6,000 per month. Husband, like Wife, submitted a statement of income and expenses. In his statement, Husband claimed to have $17,096.71 in monthly expenses, which left him with approximately $3,000 per month as disposable income. The trial court stated in its May 5, 2019 order that it "ha[d] studied carefully each party's statement of income and expenses" and then proceeded to make detailed findings concerning the reasonableness of Wife's purported expenses. Without making any findings regarding the reasonableness of Husband's expenses, the trial court ordered him to pay Wife $6,000 per month in alimony. "When a trial court fails to make sufficient findings of fact, we are unable to presume there is a factual basis for the underlying decision . . . ." *Cain-Swope*, 523 S.W.3d at 99. Furthermore, the trial court's insufficient findings of fact, violates a primary purpose of Tenn. R. Civ. P. 52.01, "which is to facilitate appellate review by 'affording a reviewing court a clear understanding of the basis of a trial court's decision.'" *Id.* (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013)).

A review of Husband's listed expenses shows that his claimed monthly expenditures included $3,800 for his mortgage payment, $1,183.72 for utilities, $1,253 for insurance, $3,433 to rent a studio for work, and $2,468 for food, clothing, etc. Consequently, absent a factual foundation that many of Husband's expenses are unreasonable, it appears that ordering Husband to pay $6,000 per month in alimony would create a substantial deficit for him. We have previously held that a trial court abuses its discretion when "order[ing] a spouse to pay alimony in an amount that would create a substantial deficit for the obligor spouse," especially where there has been no indication that the obligor spouse's income and expenses were manipulated or exaggerated. *Ezekiel v. Ezekiel*, No. W2014-02332-COA-R3-CV, 2015 WL 4916930, at *7 (Tenn. Ct. App. Aug. 17, 2015); *see also Floyd v. Floyd*, No. M2007-02420-COA-R3-CV, 2008 WL 5424014, at *12 (Tenn. Ct. App. Dec. 30, 2008); *Hazen v. Hazen*, No. W2003-00778-COA-R3-CV, 2004 WL 1334517, at *3 (Tenn. Ct. App. June 14, 2004); *Walker v. Walker*, No. E2001-01759-COA-R3-CV, 2002 WL 1063948, at *5 (Tenn. Ct. App. May 29, 2002).

In light of the trial court's failure to make sufficient findings of fact regarding Husband's ability to pay the amount of alimony awarded to Wife, we vacate the award of alimony in the amount of $6,000 per month and remand the case for reconsideration of the amount of alimony. *See Cain-Swope*, 523 S.W.3d at 100 (vacating alimony award and remanding for reconsideration when trial court failed to make sufficient findings of fact

and conclusions of law).  The trial court is directed to make findings of fact regarding the reasonableness of Husband's expenses, ascertain the amount of alimony he is able to pay, and enter a judgment setting an appropriate amount of alimony in futuro.[6]

V.  Attorney Fees.

Both Husband and Wife request that they be awarded their attorney fees incurred on appeal.  We may, in appropriate circumstances, "award prevailing parties their legal expenses incurred on appeal."  *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *11 (Tenn. Ct. App. Sept. 1, 2006).  A decision to award attorney fees on appeal rests solely within the discretion of this court.  *Diffie v. Diffie*, No. M2018-00267-COA-R3-CV, 2019 WL 1785683, at *15 (Tenn. Ct. App. Apr. 23, 2019) (citing *Willis v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014)).  When determining whether to award attorney fees, we consider "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors."  *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014).

In this case, both parties have been partially successful.  Because an award of attorney fees generally is "withheld when both parties have been at least partially successful," we decline to exercise our discretion and deny both parties' requests for attorney fees incurred on this appeal.  *Fox*, 2006 WL 2535407, at *11 (citing *Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997); *Young v. Young*, 971 S.W.2d 386, 393 (Tenn. Ct. App. 1997)).

CONCLUSION

We affirm the trial court's designation of Wife as the primary residential parent.  We also affirm the trial court's division of the marital estate as modified in this opinion.  Because the trial court attributed too much income to Husband when determining child support, the award of child support to Wife in the amount of $1,941 per month is vacated and remanded for recalculation.  Although we affirm the trial court's decision to award Wife alimony in futuro, we vacate the award of alimony in the amount of $6,000 per month and remand for reconsideration after determining Husband's ability to pay.  Costs of this appeal are assessed equally against the appellant, Kevin Michael Griffin, and the appellee, Laurel Martin Griffin, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[6] Due to our decision to vacate the alimony award of $6,000 per month and remand the issue for reconsideration, Husband's argument regarding tax considerations is pretermitted.